I am told that the calendar for Zherka v. Garland is ready, that all of the council is here, is that correct? Okay, so, thank you. And Mr. Patterson, you have reserved two minutes, is that correct? Yes, that's correct. Okay, my colleague, are you in good shape? Okay, please. Good morning, your honors. May it please the court, Pete Patterson, the appellant. The district court's decision in this case cannot stand for two reasons. First, at a minimum, the case needs to be sent back for application of Bruin in the first instance. Second, to the extent this court addresses the merits and addresses Bruin, the government has not met its burden and cannot meet its burden to show that disarming an individual on the basis of a non-dangerous offense is consistent with this nation's history of firearms regulation. On the first point, we submit that that is the test. The test under Bruin, Bruin says for every Second Amendment case, the test is, look at the plain text, and then if the conduct is covered by the plain text, it's the government's burden to prove from history that its regulation is valid. And here, the plain text is equal. Well, except, Mr. Patterson, didn't the court say a lot of other things in Bruin? The court, including references to the right belonging to law-abiding citizens, including what appears to be an approval of a Connecticut statute that has a rather broad good character type application, including referencing back to statements in Heller and McDonald that certain kinds of regulations were presumptively, I'm not sure what presumptively means, okay. Bruin points in different directions in its dicta. The holding is rather simple, though, isn't it? The holding of Bruin is that there's one test that applies in every Second Amendment case. I thought the holding of Bruin was that the Sullivan Law was unconstitutional. Yes. And one of the reasons it was unconstitutional is that there was very little, if any, precedent for anything like, there are only a few states that ever did it, and none of them were pre-20th century, for anything like a restricting the right to carry firearms to people who needed to carry firearms. Yes, and here there's even less precedent because it was not until 1961 that anyone disqualified anyone from the right to keep and bear arms on anything other than a violent offense, at least that the government has pointed to. That's barely even older than the law at issue in Heller. But even in the 18th century, vast swaths of the population were excluded from the right to carry arms on the theory that they were dangerous. Is that not right? Well, on the theory that they were dangerous. And nobody was excluded from the right to keep and bear arms on the commission of a non-dangerous offense. There was actually not an individual inquiry to make sure that all Catholics were dangerous, for example. I mean, shouldn't we be thinking about it as a perceived danger? I mean, these groups were so large, and clearly there would be individuals within them that wouldn't actually be dangerous. Why can't the idea of a perceived danger be sufficient as opposed to an actual showing of danger? Well, there was an individualized basis. The Catholics, the Loyalists would all come in and swear an oath and say, no, we're swearing allegiance to this government. Right, but there were also more offensive, broader categories of folks, right? Well, and it's important to realize that. So the Bruin asks us to look at the plain text, which says the people. Most of those restrictions were not on people that would have been considered part of the people. Right, but that's conflating two issues, right? The question is not, in my mind, who is people in terms of the Second Amendment, but rather if one comes within the confines of the Second Amendment, when can the government regulate? Right, so restrictions on people who do not come within those confines do not inform you about what sorts of restrictions are proper for people that come within those confines. So, for example, restrictions that were bigoted against Catholics who were expressly outside of textually the English right, which has been remedied, those can't form a basis for laws that restrict people who are within the people. The same with respect to discriminatory laws against African Americans, Native Americans. We see from Dred Scott. Right, but doesn't it show this broader principle of a perceived danger as opposed to an actual danger? No, I think it was an actual danger, an actual perceived danger for each and every one of those individuals. Well, the question in part, it seems to me, is what do you mean by danger? You seem to be equating dangerous with violent. When you say a non-dangerous felony, what you really mean is a non-violent felony, right? Not necessarily. As Judge Vibas said in his dissent in Falafel, there could be crimes that are associated with violence or associated with danger that are not themselves violent. Drug dealing, for example. Oh, wait, that's a perfect example. This is very puzzling to me. So we can pick and choose by saying something is associated with violence. What about being associated with just not being law-abiding, just not being someone who, in the words of the Connecticut definition, can be trusted to handle firearms and comply with the laws regarding firearms? Well, because the principle that you see from all of these examples is danger. There is no example of someone being… But danger, danger, what is danger? Danger… We talk about people being dangerous to the public because they deal drugs, for example. That's separate from an association with violence. People are detained every day on the theory that they present a danger to the community, meaning that there's a danger that they will commit crimes. Well, I would submit with the drugs, it is a danger with violence because there's no nonviolent means of resolving disputes in dealing an illegal substance. But it is an association with danger. We can look at the purpose of the Second Amendment. What Heller says, it's to protect against confrontation of another person. So it's the type of crimes that are likely to engender those sorts of complications. I thought you wanted us to look at text, and now you're wanting us to look at purpose. Bruin says it's a two-part inquiry. You look at text, and the text covers all Americans. Heller and Bruin make very clear that the text is all Americans. So then we have to go to history, and I'm offering a line of danger. If that's not the line, it's the government's burden to present you with the line. I'm offering that as a line. If it's not administrable or if it's not a burden, then the law would just be facially unconstitutional. We're not advocating that, but it's the government's burden to come in and show from history that here is where the line is drawn. But one thing we can know for sure is that there is no history of disarming non-violent or non-dangerous individuals. And here – Is it danger or violence? Yeah, it's danger. They're not interchangeable, are they? It's at a danger – that person, by their actions that they've taken, are a danger for misusing firearms. So you look at the actions they've taken. Well, he's been convicted of violating the law. Isn't he a danger that he might violate other laws such as the way you handle firearms? Well, we would submit no because that has no limiting principle. Then you could disarm individuals for serial jaywalking or something of that nature. So a line has to be drawn. Well, there's always a de minimis argument in every doctrine, so I don't think we have to worry about the jaywalking case. But are you saying violence is the test or a danger of violating the law? We're saying a danger of committing violence is the test. So violence is the key to your argument? Violence is the key to our argument, yes. Okay. No, no, no. So I've got a bunch of threshold questions, and I'm going to ask you to pull out the complaint. Okay. Because we're going to spend a decent amount of time there. Okay. So where, in your view, is the paragraph that best says that he would engage in buying a firearm if 922G1 did not exist? And while you're looking for that, why don't you let me know where it would indicate that it would be traveling in interstate commerce, where it would be indicating that it would be redressable, because Bruin still leaves in place a state law that would disenfranchise persons with felony convictions, what he intends to use it for, and why he is fearing prosecution if he purchases it? Well, Your Honor, paragraph 28 of the complaint does not contain all of those things. But he says, Plaintiff's constitutional claim is that he's entitled to exercise his rights to bear arms under the Second Amendment. And then it goes on. Okay. Where would that meet Dry House or Lujan? Right? Like, you couldn't walk in and say, like, I have standing to assert a regulation on a park because I like parks. You couldn't say I have a voting right violation because you would have to say I intend to vote. So where are the elements that you need to prove to make sure that we are supposed to be hearing this case? Well, we're at the motion-to-dismiss stage, and at the motion-to-dismiss stage, statements in the complaint at a high level of generality are taken to include the necessary subsidiary elements that can be filled in at later points in litigation. And to the extent the court were to hold that this is not enough, the proper remedy would be to reverse and enter a dismissal without prejudice to amending to include those allegations that Your Honor says is necessary. Okay. So but you think your money, you think the thing saving you from a standing problem is Paragraph 28? Well, that's one. That's one. For example, I think the thrust of the entire complaint, including in the. . . Remember, Dry House and Lujan require a little bit of specificity. You can't have something vague. I just want to make sure that I am taking your strongest argument. Do you think it's Paragraph 28 and where else? Let me see. All the introductory paragraphs. Do what? When the plaintiff says that he is challenging. . . So where is my redressability? Where is the redressability? The complaint does not reference the New York law, but, of course, understanding you don't have to have all of your injury redressed. You can have partial injury redressed. So there would be redressability here. Where is the interstate commerce claim? Well, the challenge is to the ban on possessing a firearm. Possessing a gun that is going to be in interstate commerce, which is what is needed, right, to come under the confines of 922G. Correct. But unless he is going to build a firearm from parts all sourced within the state of New York, it's going to come from interstate commerce because that is where firearms are required. This Court has held repeatedly in criminal cases of prosecution that there are no guns that are manufactured in New York. Is that not right? I will trust Your Honor on that. Well, you know, trust me. I'm asking if I'm right. And you're saying you don't know. I do not know. I don't know. What about what he intends to use it for and where that comes under Second Amendment protection? He certainly didn't plead that he's doing it for self-defense, right? Well, the Second Amendment is just for any lawful purpose. Okay. Where is the lawful purpose that he is alluding to? He does not have to plead the purpose he's going to be using the firearm for. Okay. Do my colleagues have any other questions? No. Thank you. Thank you. And I know we took them a little bit over, so you'll get the time in equivalency. Are you ready, sir? Thank you, Your Honors. May it please the Court, Lucas Issacharoff from the United States Attorney's Office for the Southern District of New York on behalf of the government. Section 922G1 prevents felons from possessing firearms. The Supreme Court has repeatedly emphasized that nothing in its Second Amendment jurisprudence casts doubt upon these prohibitions. And the Court has also repeatedly stated that the Second Amendment right belongs only to law-abiding, responsible citizens. I want to pick up on that. I just want to make sure that we're reading Heller, McDonald, and Bruin together. Is that not better understood as a reflection that those folks were, in fact, law-abiding? Like, this is a harder case than those were, right? I mean, can we be sure that that principle applied just because those folks, in fact, were law-abiding? Well, the Supreme Court in each of those cases noted that the petitioners, in particular, were law-abiding citizens. And so that element of the right was not up for dispute. But the Court also repeatedly characterized the right as belonging to law-abiding, responsible citizens. I think it's particularly instructive to look at footnote 9 of Bruin, for example, in which the Court distinguishes the may-issue regime, such as the one that New York had that was struck down in Bruin, with shall-issue licensing regimes. And in particular, the Court notes that the salience feature of shall-issue licensing regimes is that they ensure that only law-abiding, responsible citizens are able to obtain arms. Can you help me? Is your position that the people only include law-abiding? Or is it rather everyone is the people, but the government can regulate folks that are not law-abiding? I think the right of the people to bear arms does not include the right of non-law-abiding persons to bear arms. So I think that the Court can certainly read it as the people in this instance, as used within the Second Amendment, excluding felons, including people who have committed serious felony crimes. But doesn't that make the people then conflict with other amendments? I mean, you certainly don't lose your Fourth Amendment right just because you committed a crime. Well, your Fourth Amendment rights certainly are constrained during the period of incarceration, for example, or on supervised release. Does your argument depend upon us finding that the people excludes law-abiding? No, Your Honor. Okay. Explain to me why you would still prevail. Because even assuming that Mr. Zyrka does fall within the class of persons protected by the Second Amendment, contrary to what, for example, the D.C. Circuit found in Medina v. Whitaker, the government can still point to a robust historical tradition of regulating firearms access by those who have demonstrated that they cannot be trusted to follow the law. That's mostly a pretty scary thing to rely on, right? I mean, if you look at what that history is, it's almost exclusively things that today we would be appalled by and find unconstitutional. Correct? It is, Your Honor. Protestants, depending on who was the king at the time, free people of color, enslaved people. That's the main thing we've got going for us here as far as a history of excluding categories of individuals. The history is not pretty, Your Honor, but the Supreme Court has instructed us to look at that history and draw from it. Yeah, but the Supreme Court picks and chooses what history. If they don't like the history, they don't apply it. So this is history that it's hard to find anyone who would like. Well, I would point, Your Honor, for example, to Heller in which the Supreme Court looked back to some of these same repugnant restrictions in determining what constituted a bearable arm. So in Heller, the Supreme Court cites a statute that disarmed Native Americans, freed people of color, indentured servants, and decided that that shed historical light on what constitutes a bearable arm. And I think that the point that Your Honors have been picking up on is that it is not, as appellants would have it, that you need a demonstrated act of violence or danger before you can be disarmed. That the legislature was at most relying upon a perception of dangerousness. And frankly, even that overstates the history. The history includes the disarmament of Quakers for refusing to sign an affirmation. It reflects the disarmament of followers of Anne Hutchison for preaching the covenants of grace in the Massachusetts Bay Colony. There's no documented instances of Quaker rebellions or antimonian rebellions. So this idea that you need a demonstrated act of violence before you can be disarmed is ahistoric. Do you really mean to be saying that it's just perceived dangerousness? That anybody the legislature perceives as dangerous can be disarmed? I think that there is some demonstration required, and I think that that demonstration is met by the commission of a felony offense. What the Supreme Court said in Small v. United States in 2005 was that in enacting Section 922G1, Congress sought to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society. And I think that that line of commission of a serious felony offense corresponds to the line where other rights are traditionally deprived, including the right to vote, the right to hold public office, the right to serve on a jury. So I think that the historical context is clear that the commission of a felony offense, as determined by the legislature, is a serious offense that removes one from the political community in certain respects and from the rights that attend to that. And even Mr. Patterson acknowledges that the right to bear arms did not extend to all citizens or all inhabitants. It extended to the political community as it was understood. And that membership in that political community is in some instances contingent. But truly, Mr. Jerka is a member of the political community. He's not someone who is, however offensively to our present sensibilities, defined as a piece of property. He's not someone who is a member of a Native American nation, which at various times, including in certain respects today, is regarded as a separate nation. He is, of course, an American citizen, Your Honor. But he does not have a constitutionally protected right to vote. He may not be disenfranchised in the state of New York, but there are a number of states in which he would be disenfranchised. He may lack the right to hold certain public office, to serve on a jury, and he certainly lacks a Second Amendment right to bear arms as against the legislative determination that he has demonstrated he cannot be trusted to do so. Are you accepting danger as the test, or is your position the broader one, that once the person is shown not to be law-abiding, that's the end of the case? I think that it can be either dangerousness or law-abiding. I think instructive here is the proposal by the Pennsylvania Anti-Federalists for the right to bear arms, which Heller noted was an important precursor of the Second Amendment. What that proposal stated was that people may be disarmed – that people may not be disarmed unless for crimes committed or real danger of public injury from individuals. So I think that it can be either of those. We don't generally look at defeated proposals and say that's what the enacted proposal means or a proposal that – and this is a proposal that was never enacted. It was proposed as a possible constitutional amendment and is distinctly not what Madison wrote and the Congress passed and was ratified. Well, I think that as the Supreme Court characterized it in Heller, it does help shed light on what the understanding was of the scope of the rights. But I think Your Honor has also pointed to other statutes from the time of the founding that indicate other legislative enactments that indicate that the right was not understood to be unlimited. It was not understood to be – to extend to all persons and that there's no historical grounding for this idea that violence or dangerous is the sine qua non of disarmaments. But I think to follow up on Judge Newman's question, the point that I'm making is that even if dangerousness were the requisite standard, that as Judge Perez pointed out, it's not dangerousness. It's perceived dangerousness and that the legislative determination that Congress made in enacting Section 922G1 fits comfortably within and in fact is far better justified and better grounded than the legislative determinations that were made in disarming Native Americans, free people of color, Catholics, other religious dissidents, people who refused to affirm loyalty oaths. And so that – sorry. So we do think, Your Honor, that it is not dangerousness. It is dangerousness or crimes committed is dangerousness or perceived disobedience to the political sovereign, whether that's through articulation of a competing religious ideology or is here violation of serious criminal sanctions that have been established by the legislature. I suppose one issue about the difference between dangerousness and violence or dangerousness and law-abidingness is that we are perhaps dancing on the heads of pins here that I'm not sure what's the difference between setting a dangerousness standard and saying the legislature has deemed certain people dangerous for good and sufficient reasons because they're not law-abiding. I don't know. Is that different than saying that the test is not dangerousness at all? The test is law-abidingness? There are all different kinds of ways of slicing this. But the ultimate question, one way or the other, is whether the legislature is justified in deeming people who have committed serious felons unworthy of trust with firearms. I think that's something the legislature is constitutionally permitted to do. It is, Your Honor, and I think that the historical record is replete with such legislative determinations. But I think that question gets to the heart of an additional problem with Pallant's position, which is who decides? Mr. Patterson puts forward a fairly unanchored judicial determination of who would be dangerous, saying drug dealing, yes, tax fraud, no. It's perhaps trite to cite to Al Capone's conviction for tax evasion. But the point is that Congress has made a determination both as to what constitutes a serious felony offense and that— But he also said drug dealing is intrinsically linked to violence. —what purports to be a choice between dangerousness and not law-abiding. It seems to me you come down with the saying the danger is that you're not law-abiding. And so you might violate the law in any one of a number of ways, whether violent or not. So your choice—I can see a choice between violence and danger. Not all dangers are violent. But when you say you give us the choice of danger or law-abiding, don't they sort of merge that your notion of danger is a danger in that he might not violate the law? I think that they can merge in that respect, Your Honor, and that I think, as you point out, the much more important distinction is between an idea of a standard based upon dangerousness versus one based upon violence. And the idea of a violence or a violent or even a threat of violence-linked standard draws no historical support. There's no serious articulation that the Quakers, who refused on religious principle to swear an oath of loyalty, were a danger to the community or were at risk of committing some future act of violence. They had simply refused to adhere to the laws of the sovereign. Mr. Issacharoff, can I get back to something you said earlier? You said, I think rightly, fairly, that Mr. Patterson suggests that judges can pick and choose who's dangerous and who's not, and that's a bad thing. And there's no line for it. And we can say that we like white-collar fraudsters, but we don't like drug dealers, and we think they're associated with violence. And so we think that they're dangerous, regardless of what lines Congress draws. But don't you have the same problem on the other side? Where is the line that you would draw in terms of law-abidingness? And let's put jaywalking to one side as de minimis. But is there any line? How do you decide that that's de minimis, or is it a de minimis line? Can Congress or the legislature's criminalized possession of firearms by anyone convicted of regulatory offenses, for example, that are only criminalized in the first place by virtue of any violation of anything the EPA publishes is a crime? Well, I think it's important first to note here, Your Honor, that this case doesn't present those questions. This is a serious, traditional fraud felony. It was a felony that would have been potentially subjected to capital punishment at the time of the founding. He was sentenced to multiple years in prison. But accepting the premise of Your Honor's question, I think there are a couple of places the court can look to what constitutes a serious breach of the political norms. For example, in the context of the Fifth Amendment, the right to a grand jury is preserved for capital or otherwise infamous crimes. And the Supreme Court has determined that otherwise infamous crimes are those punishable by more than a year in prison. The Sixth Amendment right to a jury trial attaches for crimes that are not petty. And the Supreme Court has described petty as crimes that are punishable by less than six months in prison. So I don't know if the minimum line is six months, if it's a year, if it's something else. But I think that the line that is drawn by Section 922G1 fits comfortably within both the historical understanding of what is a serious versus a petty offense, as well as the constitutional line that has been drawn in other contexts. Can I switch gears for a little bit? I just want to make sure I know what we're having to decide. You're not asking us to find that all as-applied challenges are improper, just this one, right? That is the question presented here. The government does strongly believe that Section 922G1 is constitutional in all of its applications, but the court need not reach that question to reject Mr. Zyrka's as-applied challenge. And I understand your position to say one of the things that we don't need to remand for is because the district court ruled on the non-abrogated step of the pre-ruin analysis. But I do wonder if they're exactly coextensive. My understanding of the district court's application of Heller assumed that it was presumptively lawful and then put the burden on Mr. Zyrka to show that it wasn't, whereas Bruin has the presumption to be on the government. And do we need to make sure that there was not an issue in terms of where the burden was placed? Your Honor, it's not clear to me that Bruin does place the burden for that particular question on the government. What Bruin says is that if conduct is regulated by the Second Amendment, then the burden falls upon the government to identify an appropriate historical analog. Again, that's a burden we think we've met here. But if we're at that initial question of whether we're talking about conduct burdened by the Second Amendment— So this is back to law—a person is not law-abiding or not even within the people context. Within the context of the Second Amendment, yes, Your Honor. I think that Medina v. Whitaker remains good law within the D.C. Circuit. Hamilton v. Pelosi within the Fourth Circuit. The United States v. Fallajdar within the Third Circuit have all stated that persons who have committed serious felony offenses do not fall within the class of people protected by the Second Amendment. Unlike us, other circuits are often wrong. They're certainly not binding on us. We have to worry about the Supreme Court more than those. But I take your point that other courts have reached conclusions favorable to your position. Yes, Your Honor, but also that those conclusions remain good law. And as the Eighth Circuit recently affirmed in determining that undocumented immigrants, for example, fall outside the people, the court relied upon the same pre-Bruin precedents in determining who fell within the right to the Second Amendment. Those precedents remain good law. Those are the ones that the district court relied upon in its ruling in this case. For those reasons, unless there are any further questions. So you're saying we should rely on our old pre-Bruin precedents. Is that why you're relying on those other circuits? I think that those other circuits are persuasive authority. On that point. Okay. And I do think that the Second Circuit affirms the constitutionality of 922G1 in Bogle. But I think that both the text as informed by history of the Second Amendment and the historical application of it amply support the constitutionality of Section 922G1. Thank you, Your Honor. Thank you. And Mr. Patterson, you've got two minutes. Okay. Thank you. I'd like to address some of the historical examples that the opposing counsel cited. First, on the Quakers. They were disarmed on the basis of loyalty oath statutes. Importantly, those statutes allowed people to affirm, not just to swear an oath. So it was not because of religious principle. And they had twin aims. One, to disarm individuals who would not commit to support the American cause. But then two, and critically, to take those arms which were in shortage in the colonies and give them to people who would make that commitment. Isn't the first point, though, not particularly helpful to you? I mean if someone is not submitting themselves to the rules and laws of this country, like isn't that a close historical analog? No. This is during a time of war. Bruin footnote 26 says that those are not a good indication of what the meaning of the right is during peacetime. But in any event, these are basically potential enemy combatants, people who will not ‑‑ Quakers are potential enemy combatants. Quakers had firearms. They hunted. They could take those firearms and give them to people who were going to support the cause. But, again, it was not ‑‑ there were twin aims. The other one was to take those firearms and give them to people who would fight because there was a shortage of firearms. But there's also an analog here, too, folks, right? Who may not get them because they, in fact, were disenfranchised. That's why we have ‑‑ I'm sorry, disenfranchised. They were ‑‑ they didn't allow ‑‑ they were disarmed. I mean we have a lot of analogs. I'm saying they were taking the firearms from the people who shouldn't have them and giving them to the people who needed them to fight. But on Anne Hutchinson, it's interesting. You look at the range panel cited in an article by a person named Cooper for the Anne Hutchinson example. In that article, it said that the authorities said we need to disarm these people because they could receive a revelation from God to massacre the authorities. So even in that example, it was danger that was the key. And the ‑‑ with respect to the right to vote, Heller rejects the notion that the Second Amendment is a civic right. And the right to vote, of course, is important. But a restriction on a civic right cannot form a basis for a restriction on the fundamental individual right to keep and bear arms. And we can see the difference in history. It was commonplace to disqualify individuals from the right to vote at the founding. And it was unheard of to disqualify them from the right to keep and bear arms. And finally, in terms of the scope of this, in Lewis, the Supreme Court said that this law is a sweeping prophylaxis against the misuse of firearms. And as Judge Sutton said in his concurrence in the Tyler case, we do not have prophylactic rules that underprotect Second Amendment rights. So unless the courts have any further questions, we ask for either vacatur or reversal. Okay. Thank you so much. We will take this case under advisement. That concludes our argument on the case for the first calendar. So I will ask the courtroom deputy to adjourn the court. Thank you so much. Court stands in recess. Thank you. I vote for Judge Sutton. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Thank you. Thank you.  Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Judges of the United States Court of Appeals for the Second Circuit. Thank you. Please sit. This is the second of two calendars for today. We have three cases that are going to be argued and one case on submission. I am told that all counsel is ready. Thank you so much.